UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| SHIRLEY SCHUMACHER, | : |
| Plaintiff, | : |
| v. | :     C.A. No. 05-500-T |
| FAIRFIELD RESORTS INC., a foreign<br>Corporation doing business in RI and CORE INC.,<br>a foreign Corporation doing business in RI; and<br>A,B,C: Unknown, | :<br>:<br>:<br>: |
| Defendants. | : |

## DEFENDANT FAIRFIELD RESORTS INC.'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Fairfield Resorts Inc. ("Fairfield") hereby moves for summary judgment,
pursuant to Fed. R. Civ. P. 56, on all claims asserted against it in Plaintiff's Amended Complaint.
In support hereof, the Fairfield submits the accompanying Memorandum of Law and the
accompanying Statement of Undisputed Material Facts with Appendix of Exhibits.

FAIRFIELD RESORTS, INC.

By its Attorneys,

Martin W. Aron *(Admitted Pro Hac Vice)*
EDWARDS ANGELL PALMER & DODGE, LLP
51 John F. Kennedy Parkway
Short Hills, NJ 07078
Tel. 973- 376-7700
Telecopy 973-376-3380

John D. Doran (#6415)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
Tel. 401-274-9200
Telecopy 401-276-6611

**Certificate of Service**

       I hereby certify that on the _____ day of July 2006 a copy of the within was served by first class mail, postage prepaid to:

Keven A. McKenna, Esq.
Keven A. McKenna, P.C.
23 Acorn Street
Providence, RI  02903

Michael L. Solitro, Esq.
553 Dyer Avenue
Cranston, RI  02920

Brooks Magratten, Esq.
Timothy Bliss, Esq.
Vetter & White
20 Washington Place
Providence, RI  02903

PRV_822049_1/JDORAN

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHIRLEY SCHUMACHER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 05-500-T |
| | : | |
| FAIRFIELD RESORTS INC., a foreign | : | |
| Corporation doing business in RI and CORE INC., | : | |
| a foreign Corporation doing business in RI; and | : | |
| A,B,C: Unknown, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OF LAW ON BEHALF OF FAIRFIELD RESORTS, INC. IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Fairfield Resorts Inc. ("Fairfield") submits this Memorandum of Law in support of it Motion for Summary Judgment with respect to all claims asserted in the Amended Complaint[1] of Plaintiff Shirley Schumacher ("Plaintiff" or "Schumacher"). Schumacher's Amended Complaint alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, on the basis of her sex; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*; the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1, *et seq.*, the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1, *et seq.*, on the basis of her sex and her age; violation of the Rhode Island Parental and Family and Medical Leave Act ("RIPFMLA"), R.I. Gen. Laws § 28-48-2, *et seq.*; breach of contract; estoppel; and retaliation in violation of public policy, Title VII and the FMLA.

---

[1] On February 13, 2006, the Plaintiff requested, and was subsequently granted, leave to file an Amended Complaint asserting claims for retaliation. By cover letter dated July 12, 2006, Plaintiff filed her Amended Complaint.

## PRELIMINARY STATEMENT

Plaintiff Shirley Schumacher unilaterally took a leave of absence, refused to provide the information necessary to substantiate the need for that leave, and lost her job as a direct result of that refusal. By this action, however, she seeks to shift the blame to her former employer for her discharge, imagining nefarious motives as causes, all the while refusing to see that her poor choices were the real cause. No reasonable jury, properly motivated, could come to any other conclusion.

Schumacher was employed as a Sales Manager at the Newport, Rhode Island office of Fairfield Resorts where she was responsible for the sale of timeshares at resort properties. Her tenure was marked by several documented performance infractions. By the beginning of February 2004, she knew her supervisor was not satisfied with her performance and that she was about to be demoted for poor performance.

Schumacher applied for FMLA in February 2004, following her return from a scheduled vacation. However, CORE, Inc. (CORE), the third-party administrator of Fairfield's medical leaves denied such leave because she refused to return the medical certification forms. As a result, she failed to qualify for FMLA or RIPFMLA and her employment was administratively terminated effective March 30, 2004. She was invited to re-apply for employment when released by her physician. Schumacher did not re-apply, nor did she seek alternate employment. Instead, she collected benefits pursuant to the state temporary disability insurance program for several months. She also began collecting retirement benefits from Social Security.

According to Schumacher and her treating physician, **she was initially unable to work from February 2004 through at least September of 2004 -- approximately seven (7) months**

**after going out on leave**. Accordingly, there is no scenario under which she could have returned within the period protected under FMLA or RIPFMLA.

Furthermore, Schumacher's discrimination, contract, estoppel and retaliation claims are nothing more than an attempt to blame others for her own shortcomings. Schumacher never complained of discrimination or harassment at work despite well-publicized resources for doing so. She was fully aware that she failed to meet the legitimate expectations of her employer. Schumacher cannot establish a prima facie case of discrimination and cannot show that the legitimate reason for her termination was a pretext for discrimination.

In short, there are no genuine issues of facts for trial. By her refusal to substantiate the need for an extended leave, Schumacher failed to qualify for FMLA and caused her own termination.   Fairfield requests the Court grant its motion for summary judgment and dismiss Schumacher's Amended Complaint in its entirety.

## SUMMARY OF FACTS[2]

### Background

Fairfield is in the business of selling time shares at resort properties. (Statement of Undisputed Material Facts ("Statement") ¶ 1.) Schumacher initially began working as a salesperson in the time share industry in 1983 for a corporate predecessor to Fairfield known as The Inn Group. (Statement ¶ 2.)  After changes in corporate ownership, Schumacher became a Sales Manager, who was responsible for the recruitment and management of sales associates. Schumacher would also assist sales associates with closing sales. (Statement ¶ 3.)

The sales force at Fairfield's Newport office is diverse in both age and gender. Schumacher was 63 years old at the time of her termination. (Statement ¶ 4.) Like Schumacher, a

---

[2] The following facts are drawn from the Statement of Undisputed Material Facts submitted by Fairfield pursuant to Local Rule 56, and the Appendix of Exhibits submitted therewith.

number of sales employees were both female and in their 60's. In fact, Schumacher admits that one of her former colleagues, Tijuana Goldstein, a female sales associate who still works for Fairfield is 78 years of age. (Statement ¶ 5.) Of the one hundred individuals employed as sales associates in the years 2004 and 2005, sixty-three were over the age of 40. (Statement ¶ 6.)

Schumacher did not have any written agreement with Fairfield concerning her employment other than a Salesperson Agreement dated February 13, 2003, that covered, among other things confidentiality and compensation. (Statement ¶ 7.) That Agreement expressly states that Schumacher is employed "at-will." (Statement ¶ 7.) Schumacher admitted in her deposition that no one from Fairfield promised that she would be employed for any particular period of time. (Statement ¶ 8.) Schumacher's status as an employee "at-will" was further confirmed in Fairfield's Human Resources Policy and Procedures Manual ("PPM"). (Statement ¶ 9.)

## Fairfield Resort's Policy Prohibiting Discrimination

In addition, through its PPM Fairfield promulgated and enforced a strict policy prohibiting discrimination and harassment in the workplace. Fairfield published and promoted this policy through various means to ensure that all employees were aware of their right to make internal complaints and the procedures for doing so. Schumacher admitted in her deposition that she received a copy of the PPM. (Statement ¶ 10.) The PPM states, in pertinent part:

### 102 Equal Employment Opportunity

Fairfield Resorts is committed to providing Equal Employment Opportunity ("EEO") to all applicants and employees without regard to race, color, religion, sexual preference/orientation, age, marital status, national origin, citizenship, physical or mental disability, or status as a disabled or Vietnam Era Veteran or any other characteristic protected by law.

............................

Employees who believe that they have been discriminated against or unlawfully harassed should discuss their concerns with their supervisor or if this is not

appropriate, contact their Human Resources manager or call the toll-free Employee Relations Hotline at 1-877-756-HELP.

(Statement ¶ 10.)

## Schumacher's Failure to Report Discrimination or Harassment

Schumacher was well aware of the company's hotline and her ability to report harassment. (Statement ¶ 11.) Schumacher received a copy of Fairfield's policy entitled "Strictly Prohibited Conduct," which, among other things, prohibited abusive language and sexual harassment. (Statement ¶ 12.) Schumacher was also aware that Fairfield posted information concerning employment policies and laws at its Newport facility. (Statement ¶ 13.) She knew that if she had human resource issues, she could contact Bill Sbrocco, in Human Resources. (Statement ¶ 14.) Despite these facts, Schumacher admits she never complained of unlawful or discriminatory conduct during her employment. (Statement ¶ 15.)

## Schumacher's History of Performance Deficiencies

Plaintiff's work performance was marred by performance deficiencies during her tenure with Fairfield. Schumacher received a Notice of Corrective Action from her then supervisor, John Thomas, Vice-President of Sales, on June 14, 2002. (Statement ¶ 16.) Among other things, and as Schumacher exhibited throughout her employment, this document noted that Schumacher "projects a negative image when sales goals are not being met." (Statement ¶ 16.) Schumacher was issued a second Notice of Corrective Action only two months later on August 15, 2002, noting, among other things that she had the "highest cancellation rate" among the sales managers. (Statement ¶ 17.) Schumacher admitted in her deposition that if she were to receive a third Notice of Corrective Action, her employment would be terminated. (Statement ¶ 18.)

According to Schumacher, Thomas used vulgar language and told dirty jokes in her presence, although not referring to her. (Statement ¶¶ 19-21.)[3] Thomas was transferred to a different Fairfield facility in September of 2003 and was eventually replaced by Joseph Hutnick on September 1, 2003. (Statement ¶ 22.)  Schumacher admits that the alleged inappropriate remarks to which she was subjected were made only by Thomas, and did not continue once Hutnick became her supervisor. (Statement ¶ 23.) Schumacher described her working relationship with Hutnick as positive. "I liked the man. I had nothing against him." (Statement ¶ 24.)

At the time Hutnick became Fairfield's Vice-President of Sales in Newport, Schumacher was the Sales Manager for a program known as the Discovery Program. (Statement ¶ 25.)  In this program, potential clients that decided not to purchase a time share were offered the opportunity to enroll in a trial program at a lower cost. (Statement ¶ 26.)  Hutnick phased out the Discovery Program and replaced it with another sales program known as the Exit Program, making Schumacher the acting manager as of January 1, 2004. (Statement ¶ 27.)

### Schumacher's Disruptive and Insubordinate Conduct

The performance and attitude problems that were noted by Thomas continued under Hutnick. For example, sales associates were assigned to meet with prospective customers based on a scheduled rotation. (Statement ¶ 28.) In the beginning of January 2004, an issue arose regarding whether one sales associate, Don Pearson, had mistakenly been placed in front of another sales associate, Jim Amelia, in the rotation. (Statement ¶ 29.) This became an issue because Pearson closed a $68,000 sale with the prospective customer to whom he had been mistakenly assigned. (Statement ¶ 29.) The situation was addressed and the sales associate who

---

[3] While unable to recall many specifics, she claims Thomas referred to his own anatomy, stated "F___ that c___, you know, screw her.  That damn Donna over there doesn't belong here, she's only here for the f___ing gifts." (Statement ¶¶ 20, 21.)

had been bumped, Amelia, was satisfied with the outcome. (Statement ¶ 29.) However, Schumacher, who was not involved in the situation, attempted to instigate a dispute. (Statement ¶ 29.) Schumacher told Amelia that she heard he was "screwed" and suggested he call the integrity hotline to report Hutnick. (Statement ¶ 29.) Three employees reported Schumacher's disruptive behavior by which she sought to undermine the Vice President to whom she reported. (Statement ¶ 29.)

After several weeks of running the Exit Program, Hutnick met with Schumacher to discuss the fact that **not a single sale had been made**. (Statement ¶ 30.) Schumacher refused to take responsibility for this fact, blaming the Exit Program itself (Statement ¶ 31.) It was apparent to Hutnick that Schumacher, "had become a serious liability. She is a poor manager with no leadership qualities, and poor work habits. To make matters worse she like[d] to gossip and spread rumors. She needs to removed of her management duties." (Statement ¶ 31.)

The following day, in January, 2004, Schumacher approached Hutnick and claimed that she called Wisconsin Dells, another Fairfield location Hutnick had pointed to as an example of a successful Exit Program, and determined that it did not have an Exit Program. (Statement ¶ 32.) In effect, she called her supervisor a liar suggesting that Hutnick mislead her. (Statement ¶ 32.) Hutnick regarded Schumacher's conduct as insubordination and a challenge to his authority. (Statement ¶ 32.) Hutnick explained to Schumacher that Wisconsin Dells did in fact have an Exit Program and that it was run through the front line managers. (Statement ¶ 32.) According to Schumacher, in this conversation, Hutnick called her a "c___" – a remark that Hutnick adamantly denies (Statement ¶ 33.)[4] Schumacher admitted in her sworn deposition testimony

---

[4]Even if the Court treats this remark as true solely for purposes of summary judgment, as it must, Fairfield Resorts submits that it fails to raise any genuine issue of material fact for the reasons stated herein.

that she never made any complaint during her employment about Hutnick or Thomas. (Statement ¶ 34.)

### Schumacher's Unauthorized Leave

On February 1, 2004, Schumacher left on a pre-planned vacation to Florida. However, due to what she alleges to be work-related stress and depression, she returned early from the vacation, but she did not return to work at Fairfield. (Statement ¶ 35.) Instead, she attempted to take an extended leave of absence allegedly for what turned out to be "situational stress," although that was not timely or properly communicated by her. (Statement ¶ 41.) She concedes that when she went out on leave, she understood that Hutnick was contemplating demoting her. (Statement ¶ 36.)

Fairfield utilized CORE as its third-party administrator for handling of leaves of absence. (Statement ¶ 39.) It was CORE's task to determine eligibility for FMLA and communicate with medical providers to obtain the requisite support. (Statement ¶ 39.) It was also tasked with communicating directly with employees concerning the status of leave requests and the need to return to work in the event that a leave was not approved. (Statement ¶ 57.)   Accordingly, CORE contacted Schumacher to determine whether her leave qualified for protection under the FMLA and/or RIPFMLA. (Statement ¶ 58.)

For reasons that are neither clear nor relevant, Schumacher did not wish to have CORE monitor her leave of absence. On March 1, 2004, she advised CORE that she had been approved for TDI benefits and did not want CORE to process her claim for short-term disability benefits. (Statement ¶ 59.) Her physician's records confirm that Schumacher "prefer[red] not to have CORE Workability forms filled out." (Statement ¶ 40.) The forms necessary for her to receive FMLA leave were not returned to CORE prior to her discharge. (Statement ¶ 60.)

Schumacher did send a doctor's note to Fairfield indicating that she would be unable to return to work until April 11, 2004, due to an unidentified "medical reason" (Statement ¶ 41.) Schumacher sent a second note to Fairfield indicating that she would be out until May 11, 2004, due to "situational stress" (Statement ¶ 41.) Other than these notes, Schumacher admitted that she did not provide any documentation to support her request for leave to either Fairfield or CORE prior to the termination of her employment. (Statement ¶ 42.) Notably, representatives of Fairfield made several attempts to telephone Schumacher during her leave of absence. (Statement ¶ 43.) However, Schumacher's phone was disconnected and as a result these attempts were to no avail. (Statement ¶ 43.) Schumacher made no effort during her leave of absence to contact her supervisor or any human resource personnel to discuss when or if she planned to return to work. (Statement ¶ 43.)

### FMLA Denial and Termination

Since Schumacher did not provide proper documentation to support a request for FMLA leave, CORE deemed that request denied. Accordingly, Schumacher's employment was terminated by letter dated April 21, 2004. Schumacher was permitted to reapply for employment once her doctor approved her to return to work. (Statement ¶ 44.) She never did. (Statement ¶ 45.)

After Schumacher's refusal to supply the requisite information to support her leave, Schumacher appealed the denial of FMLA to CORE. (Statement ¶ 46.) Tellingly, in her appeal letter Schumacher wrote that she had "spoke[n] with Core in feb (sic) and informed them I had chosen to go with T.D.I. instead of FMLA." (Statement ¶ 46.) Yet, both Schumacher and her physician, Dr. James Gloor, made clear that Schumacher was "disabled" and unable to return to work for a period clearly in excess of the 13-weeks covered by the FMLA and RIPFMLA.

(Statement ¶¶ 37, 47.)[5]  By the time of her deposition, Schumacher claimed that she was unable to return to work until at least early 2005 – **approximately one year after she went out on leave for "stress and anxiety."** (Statement ¶ 37.)

Following her termination, Schumacher collected temporary disability benefits from the State of Rhode Island for a period of 26 weeks.  (Statement ¶ 48.)  In addition, Schumacher collected unemployment. (Statement ¶ 49.) She also began collecting Social Security Retirement Benefits as of June 2004 (Statement ¶ 49.) Consistent with her retirement, she did not apply for work with Fairfield or anyone else.  (Statement ¶ 50.)

## LEGAL ARGUMENT

### THE COURT SHOULD DISMISS SCHUMACHER'S DISCRIMINATION CLAIMS BECAUSE SHE CANNOT ESTABLISH THAT FAIRFIELD TERMINATED HER EMPLOYMENT BECAUSE OF HER AGE OR SEX

In Counts I, II, IV, and V of her Complaint, Plaintiff alleges that she was subjected to unlawful discrimination because of her gender and age in violation of Title VII, the ADEA, the FEPA, and the RICRA.[6]  Schumacher's discrimination claims, however, are fatally deficient and must be dismissed on the following grounds: (i) she cannot establish a *prima facie* case because she was not performing her job at a level that met Fairfield's legitimate expectations; and (ii) she cannot show that Fairfield's legitimate, nondiscriminatory reasons for the employment decisions at issue were a pretext for discrimination.

---

[5] Although Schumacher initially asserted claims of disability discrimination in her Charge of Discrimination before the EEOC and Rhode Island Commission for Human Rights, no such claim was brought in this litigation.

[6] Plaintiff's claims are couched in terms of violations of various federal laws and their state equivalents. Rhode Island courts "ha[ve] adopted the federal legal framework to provide structure to our state employment discrimination statutes." Neri v. Ross-Simons, Inc., 897 A.2d 42, 48 (R.I. 2006); see also Newport Shipyard, Inc. v. Rhode Island Comm'n for Human Rights, 484 A.2d 893 (R.I. 1984); Casey v. Town of Portsmouth, 861 A.2d 1032, 1036 (R.I. 2004); Donnelly v. Rhode Island Bd. of Governors, 110 F.3d 2, 6 (1st Cir. 1997). Therefore, Fairfield's arguments with respect to Plaintiff's federal claims apply with equal force to her state claims.

### Schumacher's Cannot Establish of A Prima Facie Case of Discrimination

Employment discrimination claims are analyzed under the burden-shifting method of proof outlined by the United States Supreme Court in McDonnell-Douglas v. Green, 411 U.S. 792 (1973), Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248 (1981), and amplified in St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993). "[T]he plaintiff's [protected status] ... must actually have played a role in the employer's decision-making process and have had a determinative or motivating influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141 (2000). A prima facie case of discrimination requires that:

> (1)[she] was at least forty years of age [or in a protected class]; (2) [her] job performance met the employer's legitimate expectations; (3) the employer subjected [her] to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services provided by the position from which the claimant was discharged.'

Gonzalez v. El Dia, Inc., 304 F.3d 63, 68 (1st Cir. 2002)).   Both age and gender claims require proof that the employee was meeting an employer's legitimate expectations. Fontanez-Nunez v. Janssen Ortho LLC, 447 F.3d 50 (1st Cir. 2006), citing Hoffman v. Applicators Sales and Serv., Inc., 439 F.3d 9, 17 (1st Cir. 2006); and Smith v. Stratus Computer, Inc., 40 F.3d 11,15 (1st Cir. 1994) cert. denied, 514 U.S. 1108 (1995).

Here, Schumacher cannot establish a prima facie case of age or sex discrimination because it is undisputed that she had not been meeting Fairfield's legitimate expectations. As was described above, Schumacher received two Notices of Corrective Action in 2002 when Thomas was her supervisor. Schumacher acknowledged in her deposition that a third Notice of Corrective Action would have resulted in her termination.  Schumacher's performance issues continued into 2004 even after Thomas' departure from the Newport facility where Schumacher

worked. According to Schumacher, just prior to her unauthorized leave for "stress," Hutnick had considered demoting her after noting her performance deficiencies. (Statement ¶ 36.)

### Schumacher's Inability to Prove Pretext

Even assuming that Schumacher could establish a prima facie case of discrimination, which she cannot, the inquiry does not end. "[T]he burden of production shifts to the defendant-employer to articulate a legitimate nondiscriminatory basis for its adverse employment action." Id. If a legitimate, non-discriminatory reason for termination is articulated by the defendant-employer, "the presumption afforded to the plaintiff's prima facie case disappears, and the plaintiff must adduce sufficient creditable evidence that age was a motivating factor in the challenged employment action." Id. Crucially, "the ultimate burden on the plaintiff is to show that discrimination is the ... motivating factor." Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir. 2000).

Fairfield's legitimate reason for Schumacher's termination was her failure to properly support a request for FMLA leave. This is clearly a legitimate, nondiscriminatory reason for the termination of Schumacher's employment. Schumacher refused to cooperate with CORE and did not timely support her FMLA leave with medical documentation as required. As such, the burden would then ordinarily shift back to Schumacher to produce sufficient evidence supportive of her position that her age or sex was the determinative factor in her termination. McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 361 (1995).

However, no such evidence exists. When asked in her deposition what facts she relies upon in support of her age claim, Schumacher referenced one trivial matter, unrelated to her age

or gender, that was fixed when she complained.[7]  Schumacher offered no evidence that younger employees as a group were more favorably treated than those who were older. Indeed, the facts belie any age-based animus. As Schumacher knows, a large percentage of Fairfield's sales force in Newport is over the age of 40. 63 out of 100 sales positions held during the years 2004 and 2005 alone were in the protected age category.[8]  Schumacher conceded in her deposition that there were many Fairfield employees and managers at the Newport facility where she worked who were in their 60's and 70's. (Statement ¶ 52).  The record is devoid of any evidence of age-bias, making summary judgment appropriate. See Hoffman, 439 F.3d at 18.

Likewise, Schumacher cannot rebut the legitimate business reason for her termination articulated by Fairfield with respect to her claim of sex discrimination. When asked what evidence she had to support that claim, Plaintiff could only respond, "I was the only female manager and they did not want me in that position." (Statement ¶ 53.) Plaintiff's conclusory and self-serving statement is completely inadequate to avoid summary judgment. Schumacher knows that she did not properly support her FMLA leave and that her termination was justified.

## SCHUMACHER CANNOT ESTABLISH THAT SHE WAS SUBJECTED TO A HOSTILE WORK ENVIRONMENT AND SUCH CLAIMS SHOULD BE BARRED AS A MATTER OF LAW

The Plaintiff does not specifically plead any hostile environment claims in her Complaint, but asserted them in her Charge before the EEOC and Rhode Island Commission for Human Rights.  She mentioned nothing of sexual harassment when asked to relate the facts supporting her claim of sex discrimination. (Statement ¶ 53.) In addition, the alleged statements

---

[7] She testified that she had to occasionally work late, stating "Like when I had to have my people come in and work the night shift, and I did it for a month. When I went to my superior and told him that I felt it was time that some other managers have their teams do it. He said it was okay, I didn't have to do it anymore." (Statement ¶ 51).

[8] There are not 100 sales people working for Fairfield in Newport at any one time. Rather, this number represents all individuals who held sales positions in the years 2004 and 2005, including those who have since terminated.

were neither severe nor pervasive, thus failing to create any hostile environment as a matter of law. Moreover, it is undisputed that Schumacher never complained of any hostile work environment. Accordingly, any such claims are barred pursuant to the affirmative defense recognized by the Supreme Court in Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998).

### Plaintiff's Burden In Establishing A Hostile Environment Claim

A hostile work environment is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). In order to establish a hostile environment claim, Plaintiff must show: (1) that she is a member of a protected class; (2) she was subjected to unwelcome harassment based on her sex; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of her employment and create an abusive environment; (4) the objectionable conduct was both objectively and subjectively offensive; and (5) employer liability. Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998).

In determining whether or not a work environment is hostile, a court will look at: (1) the frequency of the discriminatory conduct; (2) its severity, i.e., whether it is physically threatening or humiliating, or a mere offensive utterance; and (3) whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 21. The Supreme Court has also stated that "teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Faragher, 524 U.S. at 788.

The key inquiry in a hostile environment claim is whether members of one sex, but not the other, are made to suffer disadvantageous terms or conditions of employment. Harris, 510

U.S at 25 (Ginsburg, J., concurring). Thus, "workplace harassment, even harassment between men and women, is [not] automatically discrimination because of sex merely because the words used have a sexual connotation." Id. For example, there is no sexual harassment where an employee simply uses crude or inappropriate language in front of employees or draws a vulgar picture, without directing the conduct to women in general. See, e.g., Brown v. Henderson, 257 F.3d 246, 250, 256 (2d Cir. 2001) See also Lyle v. Warner Bros. Television Prods., 42 Cal. Rptr. 3d 2, 15, 132 P.3d 211 (Cal. 2006)(no hostile work environment in case involving writers for hit television show who regularly engaged in nondirected sexual antics and sexual talk).

Furthermore, "Title VII is not intended to serve as a workplace civility code, is not designed to purge the workplace of vulgarity, and does not countenance a federal cause of action for unpleasantness." Jennings v. Univ. of N.C., 444 F.3d 255, 269 (4th Cir. 2006) (citing Faragher, 524 U.S. at 788). Rather, that statute is directed at conduct that is so "severe or pervasive" as "to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788. Harassment that is occasional, isolated, sporadic, or trivial is insufficient. "[O]ffensive utterances and offhand comments do not amount to discriminatory changes in the terms and conditions of employment." Russell v. Enter. Rent-a-Car Co. of R.I., 160 F. Supp. 2d 239, 261 (D.R.I. 2001) (reference to women as "hotties" did not create hostile work environment).

## Schumacher's Inability To Establish A Hostile Work Environment

Here, Schumacher cannot show conduct that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive environment. Schumacher alleges only three specific incidents of inappropriate language. Specifically, 1) when Thomas allegedly discussed his "girth;" 2) when Thomas referred to another employee as a "c__;" and 3) when

Hutnick allegedly referred to Schumacher as a "c___." Otherwise, Schumacher referred only to general "men talk," or "dirty talk," that she felt should not be used in the workplace.

However, "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] ... because of ... sex.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (emphasis supplied). See, e.g., La Marco v. N.Y. State Nurses Assoc., 118 F. Supp. 2d 310, 318 (N.D.N.Y. 2000) (interpersonal problems between men and women wherein male defendant told female plaintiff "Go to hell, bitch," do not rise to level of a hostile environment).

Here, even assuming for purposes of this motion that Schumacher was actually offended by the "men talk" or any inappropriate comment, she cannot assert a hostile environment claim. First, based on the Harris factors, it is evident that Schumacher has not alleged sufficient facts to support her claim.  Second, there is no showing that any of the remarks were directed at Schumacher because of her sex and most were not even directed to her at all. Third, the alleged "men talk," was not physically threatening or humiliating. Fourth, there is no evidence that the comments interfered in any way with Schumacher's work.

### **Claims Barred By Statute of Limitations**

Plaintiff alleges only one incident, the alleged comment by Hutnick, which falls within the statute of limitations applicable to her Title VII and FEPA claims. Schumacher filed her charge of discrimination with the Rhode Island Commission for Human Rights on September 21, 2004.[9] Therefore, anything that occurred more than one year prior to that date is time barred pursuant to FEPA. R.I. Gen. Laws 28-5-17(a). Similarly, anything that occurred more than 300 days prior to September 21, 2004 is time barred pursuant to Title VII. 42 U.S.C. 2000e-5(e)(1).

---

[9] The charge was dual filed with the Equal Employment Opportunity Commission in keeping with the Commission's practice.

However, Thomas was replaced by Hutnick on September 1, 2003. (Statement ¶ 23.) Therefore, if Thomas did make any comments, they obviously occurred prior to that date and, therefore, outside the statute of limitations applicable to Schumacher's Title VII and FEPA claims.

### Schumacher's Claims Are Barred By Faragher and Ellerth

In addition to the failure to establish a hostile environment claim as a matter of law, Schumacher's claim is barred by her failure to take advantage of Fairfield's policies and procedures prohibiting discrimination and harassment. Employers such as Fairfield that promulgate anti-discrimination policies are entitled to an affirmative defense against hostile environment claims when employees fail to utilize the company's reasonable procedures.

The Faragher defense is comprised of two components: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to otherwise avoid harm. Faragher, 118 S.Ct. at 2291-93. "Evidence that the plaintiff failed to utilize the company's complaint procedure will normally suffice to satisfy [the company's] burden under the second element of the defense." Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267 (4th Cir. 2001); see also Faragher, 524 U.S. at 806 (a victim of sexual harassment "has a duty to use such means as are reasonable under the circumstances to avoid or minimize the damages that result from violations of the statute").

> Such procedures are of course useless if the affected employees fail to avail themselves of them.  At some point, employees must be required to accept responsibility for alerting their employers to the possibility of harassment.  Without such a requirement, it is difficult to see how [antidiscrimination statutes'] deterrent purposes are to be served, or how employers can possibly avoid liability [in a discrimination case]. Put simply, an employer cannot combat harassment of which it is unaware.

Fierro v. Saks Fifth Ave., 13 F.Supp.2d 481, 492 (S.D.N.Y. 1998).

In this case, it is undisputed that Fairfield maintained a policy and procedures manual, posted its policy at Plaintiff's workplace, and operated an employee hotline to which employees could report instances of discrimination. Schumacher admits that she received the manual, was aware that the company's policies were posted, and was aware that she could either consult a company human resources representative with any employment-related questions or could call the company's hotline with any concerns about the lawfulness of Fairfield's actions. Schumacher admits she did not avail herself of the company's complaint procedures. Her claim is plainly barred by <u>Faragher</u>, 524 U.S. at 808 and <u>Ellerth</u>, 524 U.S. at 765 (a showing of "*any* unreasonable failure [by the employee] to use *any* complaint procedure provided by the employer ... will normally suffice to satisfy the employer's burden under the second element of the defense." (emphasis added).

## THE COURT SHOULD DISMISS SCHUMACHER'S FMLA AND RIPFMLA CLAIMS BECUASE SHE FAILED TO QUALIFY FOR PROTECTION OR TIMELY SUPPORT HER LEAVE WITH APPROPRIATE DOCUMENTATION

In counts III and VI, Schumacher asserts that her termination violated the FMLA and the RIPFMLA.[10] The FMLA entitles "eligible employees to, inter alia, 'a <u>total</u> of 12 workweeks of leave,' ... for 'a serious health condition that makes the employee unable to perform the functions of [her] position.'" <u>Colburn v. Parker Hannifin/Nichols Portland Division</u>, 429 F.3d 325, 330 (1st Cir. 2005) (quoting 29 U.S.C. §§ 2612(a)(1)(D), 2612(b)). (Emphasis added.) "With limited exceptions . . . upon the employee's return from a <u>qualified leave</u>, the employer must reinstate the employee to the same position or an alternate position with equivalent pay,

---

[10] RIPFMLA provides for a maximum of thirteen (13) weeks of leave during a 24 month period; the FMLA provides for twelve (12) weeks during a 12 month period. Other than the difference in time allowance, Plaintiff's claims are identical for both statutes. Moreover, given plaintiff's inability to return to work at the expiration of 13 weeks, she cannot assert a valid FMLA or RIPFMLA claim. In her deposition, plaintiff stated that she was unable to return to work until early 2005 – nearly one year after she took leave for "situational stress." Her physician testified that she could not have returned to work until at September 2004 at the earliest.

benefits, and working conditions without loss of accrued seniority." Id. (citing Hodgens v. General Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998)).

In this case, Schumacher applied for and was denied FMLA leave because she failed to timely provide any documentation to support her request for leave to CORE. This was no inadvertent failure; rather as a notation from Schumacher's physician's office indicates, she did not want her doctor to provide information to CORE. Schumacher confirmed this statement when she spoke to CORE and then wrote in her appeal letter that she "had chosen to go with T.D.I. Instead of FMLA." (Statement ¶¶ 46, 59.) As a result of Schumacher's refusal to provide information to CORE, she was denied FMLA leave.

The FMLA expressly grants employers the right to request a medical certification to support the need for leave and requires employees to provide a certification in a "timely manner." 29 U.S.C.2613(a). The federal regulations implementing the FMLA provide that if an employee does not produce a certification, "the leave is not FMLA leave." 29 C.F.R. 825.311(b). As such, Schumacher's failure to provide CORE with the medical certification is fatal to her claim. See e.g. Rager v Dade Behring, Inc., 210 F.3d 776 (7th Cir. 2000); Hurt v. Ecolab, Inc. 2006 WL 1409520 (N.D. Tex. 2006)("[t]he failure to provide an appropriate medical certification is fatal to a claim under the FMLA.").

Even assuming that FMLA leave had been properly supported by Schumacher, which it was not, her medical absence would have far exceeded the 12 and 13 week period of protected leave guaranteed by FMLA and RIPFMLA. Ragsdale v. Wolverine Worldwide, Inc., 535 U.S. 81, 84 (2002) (defendant-employer was entitled to summary judgment on FMLA claim where employee took 42 weeks of leave). Schumacher requested leave beginning on February 11, 2004.

Accordingly, her 12 week FMLA entitlement would have expired on May 5, 2004 and her 13 week RIPFMLA entitlement would have expired on May 12, 2004.

In this action, it is beyond dispute that **Schumacher could not have returned to work until September 2004, at the earliest, some seven months after initially taking leave**. (Statement ¶ 47). Indeed, according to Schumacher's testimony at her deposition, she was unable to return to work until sometime in early 2005 – **approximately one year after she went out on her leave.** (Statement ¶ 37.) Thus, Schumacher's leave would not have been protected under any circumstance and Fairfield was entitled to terminate her employment as a matter of law. "[A]n employee has no right to reinstatement 'if the employee is unable to perform an essential function of the position because of . . . the continuation of a serious health condition.'" Colburn, 429 F.3d at 332 (quoting 29 C.F.R. § 825.214(b)).

In a case that is strikingly similar to this matter, the Sixth Circuit rejected an FMLA claim when it was undisputed that the employee could not have returned to work within the 12 week FMLA period, even though the employee was terminated before the expiration of that period. Edgar v. JAC Products, Inc., 443 F. 3d 501 (6th Cir. 2006). In Edgar, the plaintiff went out on a medical leave due to work related stress in September 2002. Plaintiff met shortly thereafter with her supervisor and a human resources representative to discuss her leave. Plaintiff was provided with a medical certification form to support her request for FMLA.

According to the company, plaintiff was instructed to return the certification form by October 18, 2002. The plaintiff contended that she was told to return the form by October 21, 2002. The employer, after not receiving the form by October 18, 2002, mailed plaintiff a letter terminating her employment on October 21, 2002. The plaintiff returned the form on either October 21, 2002 or the following day. Subsequent to her termination, plaintiff was deemed

unable to return to work by one of her psychiatrists until March 4, 2004 – years after the date of her leave.

The plaintiff filed suit claiming that she was denied rights to which she was entitled under the FMLA. The District Court granted summary judgment to the employer, holding that because the employee was not able to return to work at the time her FMLA leave would have expired, she had no claim under the FMLA. Edgar, 443 F. 3d at 506. The Sixth Circuit upheld the district court's dismissal of FMLA claims, noting that "the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends." Edgar, 443 F. 3d at 507 (*quoting* Throneberry v. McGehee Desha County Hosp., 403 F. 3d 972, 978 (8th Cir. 2005)).

In short, Schumacher failed and/or refused to cooperate with CORE and supply the information required to entitle her to leave under FMLA and RIPFMLA. As such she was not eligible for protection under either of these statutes. Alternatively, applying the analysis of the 6th Circuit in JAC Products, Schumacher was unable to work until September 2004 at the earliest – well in excess of any protected leave. There is no evidence contradicting this diagnosis. Since Schumacher was unable to return to work within 12 or 13 weeks after taking leave, her FMLA and RIPFMLA claims should be dismissed.

## THE COURT SHOULD DISMISS SCHUMACHER'S RETALIATION CLAIMS BECAUSE SHE FAILED TO EXHAUST ADMINISTRATIVE REMEDIES AND SUCH CLAIMS ARE INSUPPORTABLE AS A MATTER OF LAW

In addition to alleging that her termination was because of her sex and age and in violation of the FMLA and RIPFMLA, Schumacher also claims in Counts VII and X that her termination was in retaliation for engaging in protected activity in violation of Rhode Island

public policy, Title VII and the FMLA.[11]   These claims should be dismissed because Schumacher failed to exhaust her administrative remedies by including them in her EEOC and RICHR claims with respect to Title VII. Moreover, as to both Title VII and FMLA, her retaliation claims must be dismissed because Schumacher cannot establish a prima facie case of retaliation or rebut Fairfield's legitimate business reason for her termination.

### Schumacher's Failure To Exhaust Administrative Remedies

It is well settled that Title VII requires exhaustion of administrative remedies as a condition precedent to filing suit in federal court. Jensen v. Frank, 912 F.2d 517,520 (1st Cir. 1990). The First Circuit has stated that " '[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded' even in sympathetic circumstances." Id. At 522 (quoting Baldwin County Welcome Center v. Brown, 466 U.S. 147, 152 1984)). A complaint related to that brought before the [Equal Employment Opportunity Commission ("EEOC") ], but which was not itself made the subject of a separate EEOC complaint, must reasonably be expected to have been within the scope of the EEOC's investigation in order to meet the jurisdictional prerequisite." Machado v. Frank, 767 F.Supp. at 421 (quoting Johnson v. General Electric, 840 F.2d 132 139 (1st Cir. 1988).

In this action, Schumacher filed her administrative charge **after** she was discharged, but did not make a retaliation claim. She cannot now decide to add it when she could have raised it, but did not, in front of the agency.   She failed to exhaust administrative remedies and her retaliation claim must be dismissed.

### Schumacher's Inability to Establish A Prima Facie Claim of Retaliation

Even assuming that the Court finds that Schumacher properly exhausted administrative remedies, she cannot establish any claim of unlawful retaliation.   In order to prove retaliation

---

[11] Plaintiff's retaliation claim in violation of public policy will be discussed below.

under Title VII, "a plaintiff must establish that (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse employment action." <u>Calero-Cerez v. United States Department of Justice</u>, 355 F.3d 6, 25 (1st Cir. 2004); <u>Orta-Castro v. Merck, Sharp & Dohme Quimica P.R.</u>, 447 F.3d 105, 113-14 (1st Cir. 2006).

As with her other claims, Schumacher has failed to present a genuine issue of material fact. When asked at her deposition to state the facts supporting her retaliation claim, she answered "I can't remember right now." (Statement ¶ 56). This is not surprising, since Schumacher also admitted that she never complained of any type of discrimination or harassment during her employment. That is, she never engaged in protected conduct.

The above-referenced analysis applies to Schumacher's claim of retaliation in violation of the FMLA as well. <u>See</u> <u>Gonzalez v. City of Minneapolis</u>, 267 F.Supp.2d 1004, 1011 (D.Minn. 2003) (Establishing a *prima facie* case of retaliation under FMLA and Title VII involves the same three-pronged analysis used for Title VII claims.) Schumacher has failed to specify what activity protected by the FMLA she engaged in which forms the predicate for her retaliation claim. Furthermore, "where the employee takes leave, or requests to take leave, that [she] is not eligible for, . . . the employee cannot be deemed to have engaged in protected activity and, therefore, termination by the employer in such circumstance cannot be grounds to support a retaliation claim under the FMLA." <u>Pashoian v. GTE Directories</u>, 208 F.Supp.2d 1293, 1303 (M.D. Fla. 2002).

### **Schumacher's Inability to Show A Causal Connection**

Even assuming that Schumacher could establish the first prong of the *prima facie* test, she cannot set forth any causal connection between the alleged "protected conduct" and her

termination.  To establish a causal connection between participation in a protected activity and an adverse employment action, a plaintiff must show "that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." Id. at 1305. (Quotations omitted).  Since Schumacher cannot show that she engaged in any allegedly protected activity, it is impossible for her to show that the alleged adverse action and such conduct were not "wholly unrelated." Accordingly, her retaliation claims should be dismissed.

## THE COURT SHOULD DISMISS SCHUMACHER'S BREACH OF CONTRACT CLAIM BECAUSE SHE WAS AN EMPLOYEE AT WILL

In Count VIII of her Complaint, Schumacher alleges that Fairfield breached the "express and implied terms and conditions of the understanding and agreement between the defendant's [sic] and the plaintiff as employer and employee."  Plaintiff is unable to identify these "express and implied terms" because none exist.

It is undisputed that Plaintiff and Fairfield were not parties to an any employment agreement that guaranteed plaintiff continued employment. Plaintiff and Fairfield were parties to an agreement known as a Salesperson Agreement. However, that agreement had nothing to do with the continuation or termination of Plaintiff's employment. Rather, the Agreement governed the commissions Plaintiff would receive as a salesperson. The Salesperson Agreement specifically confirmed Plaintiff's status as an at-will employee. Moreover, there is no evidence adduced by Schumacher that Fairfield breached any terms of that Agreement.

In her deposition, Schumacher admitted that no Fairfield employee ever promised her a job for particular period of time:

> Q.    So did anyone ever tell you that you would have a management job or any job, for that matter, for a particular period of time ...

    A.    No.

(Statement ¶ 54.)

When questioned about what facts she relied on in support of her breach of contract claim, Schumacher replied:

    A.    They breached the contract by not allowing me my rights.

    Q.    What rights?

    A.    Any rights that I'm entitled to.

    Q.    Is there some right in particular that you believe entitled you to continuing employment?

    A.    No.

(Statement ¶ 55.)

To the extent Schumacher relies on Fairfield's employee handbook to support her implied contract argument, the Rhode Island Supreme Court very recently reaffirmed its stance on this issue and held that "employee handbook[s] do not create a contract under Rhode Island law." Neri v. Ross-Simons, Inc., 897 A.2d 42, 47 (R.I. 2006) (affirming summary judgment where a plaintiff-employee sought "to circumvent the 'at will' rule by arguing that the employee handbook" entitled her to certain protections from dismissal).

In short, Schumacher cannot establish that there has been any breach of contract concerning her employment. Schumacher has introduced no evidence to support an argument that she was anything but an employee at-will who was properly subject to termination when she failed to properly supply requested information to support a medical leave of absence.

## THE COURT SHOULD DIMISS SCHUMACHER'S ESTOPPEL CLAIM

In Count IX, Plaintiff claims that Fairfield "should be estopped to deny their promises and commitments to follow the policies and procedures set fourth (sic) in their personnel manual governing the application of equal treatment to its employees, which the plaintiff relied upon to her detriment." The claim appears derivative of Schumacher's breach of contract claim in the sense that it is based on allegedly binding promises made in Fairfield's Policy and Procedure Manual. If that is the case, the claim fails for the same reasons discussed above.

Furthermore, the Rhode Island Supreme Court has spoken on this issue holding that because employees "who are hired for an indefinite period with no contractual right to continued employment are [considered] at-will employees [who are] subject to discharge at any time for any permissible reason or for no reason at all," reliance on any alleged promise regarding employment is neither reasonable nor actionable. Galloway v. Roger Williams University, 777 A.2d 148, 150 (R.I. 2001). Accordingly, Schumacher cannot sustain a claim for estoppel or detrimental reliance based on statements made in Fairfield's employee handbook.

## THE COURT SHOULD DISMISS SCHUMACHER'S PUBLIC POLICY CLAIM BECAUSE THAT CAUSE OF ACTION IS NOT COGNIZABLE UNDER RHODE ISLAND LAW

In addition to claiming that her violation was because of her age, her sex, in violation of the FMLA, in retaliation for unidentified protected activity, and in breach of a non-existent contract, Schumacher also claims in Count VII that her termination was in violation of the public policy of the State of Rhode Island.[12] Rhode Island is, with one limited (and debatable)

---

[12] The precise nature of Plaintiff's public policy claim is unclear. In her original Complaint, Plaintiff alleged in Count VII that the termination of her "employment on account of her work related injury was a violation of the public policy of the state of Rhode Island." (Complaint, ¶ 38.) In the Amended Complaint, Count VII was transformed to allege that the termination of Plaintiff's employment "was retaliatory and a violation of public policy

exception, an employment-at-will jurisdiction. <u>Roy v. Woonsocket Institution for Savings</u>, 525 A.2d 915, 917 (R.I. 1987) (affirming directed verdict where plaintiff-employee could not point out any provision in his employer's operations manual or employee handbook that could give rise to a reasonable belief that plaintiff's employment status was something other than at-will); <u>see also</u> <u>DelSignore v. Providence Journal Co.</u>, 691 A.2d 1050, 1051 n.5 (R.I. 1997) ("In Rhode Island the general rule is that employees who are hired for an indefinite period with no contractual right to continued employment are at-will employees subject to discharge at any time for any permissible reason or for no reason at all."); <u>Payne v. K-D Mfg. Co.</u>, 520 A.2d 569, 573 (R.I. 1987); <u>Lopez v. Bulova Watch Co.</u>, Inc., 582 F.Supp. 755, 767 n.19 (D.R.I. 1984); <u>Brainard v. Imperial Mfg. Co.</u>, 571 F.Supp. 37, 39 (D.R.I. 1983).

The narrow exception to the Rhode Island rule is the product of a holding in one case that an at-will employee "possesses a cause of action in tort against an employer who discharges the employee for reporting employer conduct that violates an express statutory standard." <u>Cummins v. EG&G Sealol, Inc.</u>, 690 F.Supp. 134, 139 (D.R.I. 1988); <u>see also</u> <u>Dunfey v. Roger Williams University</u>, 824 F.Supp. 18, 23 (D.Mass. 1993) (discussing Rhode Island employment law and the holding in <u>Cummins</u>).   The Rhode Island Supreme Court, however, has since clarified the law on this issue, stating, "we now unequivocally state that in Rhode Island there is no cause of action for wrongful discharge." <u>Pacheco v. Raytheon Co.</u>, 623 A.2d 464, 465 (R.I. 1993); <u>see also</u> <u>Andrade v. Jamestown Housing Authority</u>, 82 F.3d 1179, 1188 (1st Cir. 1996) (noting the unequivocal nature of the holding in Pacheco); <u>Henderson v. Tucker Anthony and RL Day</u>, 721 F.Supp. 24, 27 (D.R.I. 1989).   Accordingly, Plaintiff's public policy claims fail as a matter of law.

---

of the State of Rhode Island." (Amended Complaint, ¶ 38.) Whether Plaintiff is alleging a direct public policy violation or a retaliation claim is ultimately irrelevant because Rhode Island does not recognize any wrongful discharge claims grounded solely in public policy.

## THE UNIDENTIFIED DEFENDANTS ARE NOT REAL PARTIES IN INTEREST AND CLAIMS AGAINST THEM SHOULD BE DISREGARDED

Plaintiff captioned her Complaint and Amended Complaint as including claims against three unidentified defendants referred to as "A, B, C: Unknown." Plaintiff did not make any specific allegations against these unidentified defendants so it is not clear why they were included in the caption. Regardless, "(w)here a complaint asserting claims against 'John Doe' defendants has not been amended to substitute defendants who are real parties in interest as soon as the identity is known or reasonably should have been known or, in any event, before the close of discovery, such an assertion is mere surplusage and will be disregarded by the court." Rodriguez v. City of Passaic, 730 F.Supp. 1314, n.7 (D.N.J. 1990).   Accordingly, to the extent Schumacher is attempting to bring claims against these unidentified defendants, those claims should be dismissed.

## SUMMARY JUDGMENT IS APPROPRIATE IN THIS CASE

Rule 56(c) of the Federal Rules of Civil Procedure provides in pertinent part that:

> [J]udgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Thus, as the Supreme Court stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

"The mere existence of a factual dispute is not enough to defeat summary judgment . . . .The party opposing summary judgment must demonstrate that there are bona fide factual issues which 'need to be resolved before the related legal issues can be decided.'"   Gosselin v.

McGillen, 847 F. Supp 248, 252 (D.R.I. 1993) (citing Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)).[13]

As shown above, there are no genuine issues with respect to any material facts on all of Schumacher's claims. Accordingly, summary judgment is appropriate and Schumacher's claims should be dismissed in their entirety with prejudice.

## **CONCLUSION**

For all of the foregoing reasons, Fairfield Resorts, Inc., requests that the Court grant its motion of summary judgment, dismissing the Complaint and Amended Complaint in its entirety with prejudice.

FAIRFIELD RESORTS, INC.

By its Attorneys,

Martin W. Aron (*Admitted Pro Hac Vice*)
EDWARDS ANGELL PALMER & DODGE, LLP
51 John F. Kennedy Parkway
Short Hills, NJ  07078
Tel. 973- 376-7700
Telecopy 973-376-3380

John D. Doran (#6415)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI  02903
Tel. 401-274-9200
Telecopy 401-276-6611

---

[13] A factual issue is "material" only if it might affect the outcome of the case under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Further, an issue can be "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the party opposing the motion. Id. at 249. Thus, in order to show that there is a genuine issue of material fact, the non-moving party must offer objective facts to support her claims beyond the mere allegations in the complaint. Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991) ("[p]roof based on arrant speculation, optimistic surmise or farfetched inference will not suffice" to defeat summary judgment).

### Certificate of Service

I hereby certify that on the _____ day of July 2006 a copy of the within was served by first class mail, postage prepaid to:

Keven A. McKenna, Esq.
Keven A. McKenna, P.C.
23 Acorn Street
Providence, RI  02903

Michael L. Solitro, Esq.
553 Dyer Avenue
Cranston, RI  02920

Brooks Magratten, Esq.
Timothy Bliss, Esq.
Vetter & White
20 Washington Place
Providence, RI  02903