UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| SHIRLEY SCHUMACHER,<br><br>Plaintiff,<br><br>v.<br><br>FAIRFIELD RESORTS INC., a foreign Corporation doing business in RI and CORE INC., a foreign Corporation doing business in RI; and A,B,C: Unknown,<br><br>Defendants. | : | C.A. No. 05-500-T |

**DEFENDANT FAIRFIELD RESORTS INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, Defendant Fairfield Resorts Inc. ("Fairfield") submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

1. Fairfield is a Delaware corporation in the time share business maintaining its principal place of business at 8427 South Park Circle, Orlando, Florida, 32819. (Answer of Fairfield Resorts, Inc. ("Answer") at ¶ 6.)

2. The Plaintiff, Shirley Schumacher ("Schumacher"), initially began working as a salesperson in the time share industry in 1983 for a corporate predecessor to Fairfield known as The Inn Group. (Deposition of Shirley Schumacher ("Schumacher Deposition"), pp. 19-21, 24; attached hereto as Exhibit A.)

3. After changes in corporate ownership, Schumacher became a Sales Manager, who was responsible for the recruitment and management of sales associates. Schumacher would also

assist sales associates with closing sales. (Schumacher Deposition, pp. 25-28, 30; Affidavit of Walter Carey ("Carey Affidavit"), Exhibit 1; attached hereto as Exhibit B.)

4. Schumacher was born on December 12, 1939. (Schumacher Complaint ("Complaint") at ¶ 9).

5. Schumacher admits that one of her former colleagues, Tijuana Goldstein, a female sales associate who still works for Fairfield is 78 years of age. (Schumacher Deposition, p. 12.)

6. Of the one hundred individuals employed as sales associates in the years 2004 and 2005, sixty-three were over the age of 40. (Carey Affidavit, Exhibit 2.)

7. Schumacher did not have any written agreement with Fairfield concerning her employment other than a Salesperson Agreement dated February 13, 2003, that covered, among other things confidentiality and compensation. That Agreement expressly states that Schumacher is employed "at-will." (Carey Affidavit, Exhibit 3.)

8. Schumacher admitted in her deposition that no one from Fairfield promised that she would be employed for any particular period of time. (Schumacher Deposition, p. 34.)

9. Schumacher's status as an employee "at-will" was further confirmed in Fairfield's Human Resources Policy and Procedures Manual ("PPM"). (Carey Affidavit, Exhibit 4.)

10. Fairfield promulgated and enforced a strict policy prohibiting discrimination and harassment in the workplace. Fairfield published and promoted this policy through various means to ensure that all employees were aware of their right to make internal complaints and the procedures for doing so. Schumacher admitted in her deposition that she received a copy of the PPM. The PPM states in pertinent part:

> **102 Equal Employment Opportunity**
>
> Fairfield Resorts is committed to providing Equal Employment Opportunity ("EEO") to all applicants and employees without regard to race, color, religion,

> sexual preference/orientation, age, marital status, national origin, citizenship, physical or mental disability, or status as a disabled or Vietnam Era Veteran or any other characteristic protected by law.
>
> ............................
>
> Employees who believe that they have been discriminated against or unlawfully harassed should discuss their concerns with their supervisor or if this is not appropriate, contact their Human Resources manager or call the toll-free Employee Relations Hotline at 1-877-756-HELP.

(Schumacher Deposition, p. 36; Carey Affidavit, Exhibit 4.)

11. Schumacher was well aware of the company's hotline and her ability to report harassment. (Schumacher Deposition, pp. 47, 48)

12. Schumacher received a copy of Fairfield's policy entitled "Strictly Prohibited Conduct," which, among other things, prohibited abusive language and sexual harassment. (Schumacher Deposition, p. 68; Carey Affidavit, Exhibit 5.)

13. Schumacher was also aware that Fairfield posted information concerning employment policies and laws at its Newport facility. (Schumacher Deposition, p. 49.)

14. Schumacher knew that if she had human resource issues, she could contact Bill Sbrocco, in Human Resources. (Schumacher Deposition, p. 49.)

15. Schumacher admits she never complained of unlawful or discriminatory conduct during her employment. (Schumacher Deposition, pp. 68-69.)

16. Plaintiff's work performance was marred by performance deficiencies during her tenure with Fairfield. Schumacher received a Notice of Corrective Action from her then supervisor, John Thomas, Vice-President of Sales, on June 14, 2002. Among other things, and as Schumacher exhibited throughout her employment, this document noted that Schumacher "projects a negative image when sales goals are not being met." (Carey Affidavit, Exhibit 6.)

17. Schumacher was issued a second Notice of Corrective Action only two months later on August 15, 2002, noting, among other things that she had the "highest cancellation rate" among the sales managers. (Carey Affidavit, Exhibit 7.)

18. Schumacher admitted in her deposition that if she were to receive a third Notice of Corrective Action, her employment would be terminated. (Schumacher Deposition, p. 65.)

19. According to Schumacher, Thomas used vulgar language and told dirty jokes in her presence, although not referring to her. (Schumacher Deposition, pp. 70-72.)

20. While unable to recall many specifics, she claims Thomas referred to his own anatomy. (Schumacher Deposition, pp. 70-72.)

21. Schumacher alleges that she heard Thomas say "F___ that c___, you know, screw her. That damn Donna over there doesn't belong here, she's only here for the f___ing gifts." (Schumacher Deposition, p. 72).

22. Thomas was transferred to a different Fairfield facility and was eventually replaced by Joseph Hutnick on September 1, 2003. (Affidavit of Joseph Hutnick, ¶ 2 ("Hutnick Affidavit") attached hereto as exhibit C)

23. Schumacher admits that the alleged inappropriate remarks to which she was subjected were made only by Thomas, and did not continue once Hutnick became her supervisor. (Schumacher Deposition, p. 74.)

24. Schumacher described her working relationship with Hutnick as positive stating, "I liked the man. I had nothing against him." (Schumacher Deposition, p. 81.)

25. At the time Hutnick became Fairfield's Vice-President of Sales in Newport, Schumacher was the Sales Manager for a program known as the Discovery Program. (Schumacher Deposition, p. 42.)

26. In this program, potential clients that decided not to purchase a time share were offered the opportunity to enroll in a trial program at a lower cost. (Schumacher Deposition, p. 43.)

27. Hutnick phased out the Discovery Program and replaced it with another sales program known as the Exit Program, making Schumacher the acting manager as of January 1, 2004. (Hutnick Affidavit, Exhibit 1.)

28. Sales associates were assigned to meet with prospective customers based on a scheduled rotation. (Schumacher Deposition, p. 29.)

29. In the beginning of January 2004, an issue arose regarding whether one sales associate had mistakenly been placed in front of another sales associate in the rotation. This became an issue because the sale associate who closed the deal closed a $68,000 sale with the prospective customer to whom he had been mistakenly assigned. The situation was addressed and the sales associate who had been bumped, Amelia, was satisfied with the outcome. However, Schumacher, who was not involved in the situation, attempted to instigate a dispute. Schumacher told the sales associate who was bumped that she heard he was "screwed" and suggested he call the integrity hotline to report Hutnick. Three employees reported Schumacher's disruptive behavior by which she sought to undermine the Vice-President to whom she reported. (Hutnick Affidavit, Exhibit 2.)

30. After several weeks of running the Exit Program, Hutnick met with Schumacher to discuss the fact that not a single sale had been made. (Schumacher Deposition, p. 79.)

31. Schumacher refused to take responsibility for this fact, blaming the Exit Program itself. It was apparent to Hutnick that Schumacher, "had become a serious liability. She is a poor manager with no leadership qualities, and poor work habits. To make matters worse she like[d] to gossip

and spread rumors. She needs to removed of her management duties." (Hutnick Affidavit, Exhibit 3.)

32. The following day, in January, 2004, Schumacher approached Hutnick and claimed that she called Wisconsin Dells, another Fairfield location Hutnick had pointed to as an example of a successful Exit Program, and determined that it did not have an Exit Program. In effect, she called her supervisor a liar suggesting that Hutnick mislead her. Hutnick regarded Schumacher's conduct as insubordination and a challenge to his authority. Hutnick explained to Schumacher that Wisconsin Dells did in fact have an Exit Program and that it was run through the front line managers. (Hutnick Affidavit, Exhibit 3.)

33. Schumacher alleges that Hutnick called her a "c___" during this conversation. (Schumacher Deposition, p. 77.)

34. Schumacher admitted in her sworn deposition testimony that she never made any complaint during her employment about Hutnick or Thomas. (Schumacher Deposition, p. 87.)

35. On February 1, 2004, Schumacher left on a pre-planned vacation to Florida. However, due to what she alleges to be work-related stress and depression, she returned early from the vacation, but she did not return to work at Fairfield. (Schumacher Deposition, pp. 89, 91).

36. Schumacher concedes that when she went out on leave, she understood that Hutnick was contemplating demoting her. (Schumacher Deposition, p. 106.)

37. Schumacher testified that she could not return to work until sometime in 2005 at the earliest. (Schumacher Deposition, p. 95)

38. Schumacher started collecting social security benefits in June 2004. (Affidavit of Robert Sweeney ("Sweeney Affidavit"); attached hereto as exhibit D.)

39. Fairfield utilized CORE as its third-party administrator for handling of leaves of absence. It was CORE's task to determine eligibility for FMLA and communicate with medical providers to obtain the requisite support. (Affidavit of Andrew Bernstein ("Bernstein Affidavit"), ¶ 3; attached hereto as Exhibit E.)

40. Schumacher's physician's records confirm that Schumacher "prefer[red] not to have CORE Workability forms filled out." (Deposition of Dr. James Gloor ("Gloor Deposition"), Deposition Exhibit G; attached hereto as Exhibit F.)

41. Schumacher provided Fairfield with a note from Dr. Gloor stating that she would be unable to return to work until April 11, 2004, due to an unidentified "medical reason." Schumacher sent a second note stating she would be unable to return to work until May 11, 2004 due to "situational stress." (Schumacher Deposition, Exhibit 11.)

42. Other than these notes, Schumacher admitted that she did not provide any documentation to support her request for leave to either Fairfield or CORE prior to the termination of her employment. (Schumacher Deposition, pp. 102-103.)

43. Representatives of Fairfield made several attempts to telephone Schumacher during her leave of absence. However, Schumacher's phone was disconnected and as a result these attempts were to no avail. Schumacher made no effort during her leave of absence to contact her supervisor or any human resource personnel to discuss when or if she planned to return to work. (Schumacher Deposition, p. 33.)

44. Since Schumacher did not provide proper documentation to support a request for FMLA leave, CORE deemed that request denied. Accordingly, Schumacher's employment was terminated by letter dated April 21, 2004. Schumacher was permitted to reapply for employment once her doctor approved her to return to work. (Carey Affidavit, Exhibit 8.)

45. Since the time of her termination, Schumacher has neither reapplied to Fairfield nor sought alternate employment elsewhere. (Schumacher Deposition, pp. 12, 15.)

46. After Schumacher's refusal to supply the requisite information to support her leave, Schumacher appealed the denial of FMLA to CORE. In her appeal letter she wrote that she "had spoke[n] with CORE in Feb (sic) and informed them I had chosen to go with T.D.I. instead of FMLA." (Schumacher Deposition, Exhibit 18.)

47. Schumacher's physician testified that she was unable to return to work until September 13, 2004, at the earliest. (Gloor Deposition, p. 24.)

48. Following her termination, Schumacher collected temporary disability benefits from the State of Rhode Island for a period of 26 weeks. (Schumacher Deposition, p. 110.)

49. Schumacher also collected unemployment benefits and social security benefits. (Schumacher Deposition, Exhibits 24 & 25; Sweeney Affidavit ¶ 3 )

50. Consistent with her retirement, Schumacher did not apply for work with Fairfield or anyone else. (Schumacher Deposition, pp. 14-15.)

51. Schumacher testified that she had to occasionally work late, stating "Like when I had to have my people come in and work the night shift, and I did it for a month. When I went to my superior and told him that I felt it was time that some other managers have their teams do it. He said it was okay, I didn't have to do it anymore." (Schumacher Deposition, p. 120.)

52. Schumacher conceded in her deposition that there were many Fairfield employees and managers at the Newport facility where she worked who were in their 60's and 70's. (Schumacher Deposition, p. 122.)

53. When asked what evidence she had to support her age discrimination claim, Plaintiff could only respond, "I was the only female manager and they did not want me in that position." (Schumacher Deposition, p. 123.)

54. Schumacher offered no evidence to support her assertion that she had an implied contract with Fairfield. In her deposition she was asked:

> Q. So did anyone ever tell you that you would have a management job or any job, for that matter, for a particular period of time, that's the question? We're going to employ you for two years, five years, one year; did anyone state a duration?
> A. No.

(Schumacher Deposition, p. 34.)

55. When asked in her deposition what facts she relied on in support of her breach of contract claim, Schumacher replied:

> A. They breached the contract by not allowing me my rights.
> Q. What rights?
> A. Any rights that I'm entitled to.
> Q. Is there some right in particular that you believe entitled you to continuing employment?
> A. No.

(Schumacher Deposition, p. 124.)

56. When asked in her deposition to state the facts supporting her retaliation claim, she answered "I can't remember right now." (Schumacher Deposition, p. 125)

57. CORE communicates directly with employees concerning the status of leave requests and the need to return to work in the event that a leave is not approved. (Bernstein Affidavit, ¶ 9)

58. CORE contacted Schumacher to determine whether her leave qualified for protection under the FMLA and/or RIPFMLA. (Bernstein Affidavit, ¶ 9)

59. On March 1, 2004, Schumacher advised a CORE representative that she had been approved for TDI benefits and did not want CORE to process her claim for short-term disability benefits. (Bernstein Affidavit, ¶ 10)

60. The forms necessary for Schumacher to receive FMLA leave were not returned to CORE prior to her discharge. (Bernstein Affidavit, ¶ 12)

FAIRFIELD RESORTS, INC.

By its Attorneys,

Martin W. Aron (*Admitted Pro Hac Vice)*
EDWARDS ANGELL PALMER & DODGE, LLP
51 John F. Kennedy Parkway
Short Hills, NJ 07078
Tel. 973- 376-7700
Telecopy 973-376-3380

John D. Doran (#6415)
EDWARDS ANGELL PALMER & DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
Tel. 401-274-9200
Telecopy 401-276-6611

**Certificate of Service**

I hereby certify that on the 17th day of July 2006 a copy of the within was served by first class mail, postage prepaid to:

Keven A. McKenna, Esq.
Keven A. McKenna, P.C.
23 Acorn Street
Providence, RI 02903

Michael L. Solitro, Esq.
553 Dyer Avenue
Cranston, RI 02920

Brooks Magratten, Esq.
Timothy Bliss, Esq.
Vetter & White
20 Washington Place
Providence, RI 02903