UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SHIRLEY SCHUMACHER,
Plaintiff

VS. C.A NO. 05-500T

FAIRFIELD RESORTS, INC.,
a foreign Corporation doing
business in RI and CORE, INC.,
a foreign Corporation doing
business in RI; and
A, B, C; Unknown,
Defendants

DEPOSITION of JAMES D. GLOOR, M.D., a witness in the above-entitled cause, taken on behalf of the Defendant, Fairfield Resorts, Inc., before Lori L. Spremulli, Notary Public, R.P.R., in and for the State of Rhode Island, at the office of James D. Gloor, M.D., Wickford Junction Medical Walk-In, located at 1051 Ten Rod Road, Unit B, North Kingstown, Rhode Island 02903, on Friday, June 9, 2006, at 10:00 A.M.

PRESENT,
FOR THE PLAINTIFF,
M. L. SOLITRO & ASSOCIATES
BY: MICHAEL L. SOLITRO, ESQ.
FOR THE DEFENDANTS,
EDWARDS ANGELL PALMER & DODGE, LLP.
BY: JOHN D. DORAN, ESQ.
FOR: FAIRFIELD RESORTS, INC.
- and -
VETTER & WHITE
BY: TIMOTHY M. BLISS, ESQ.
FOR: CORE, INC.

ALLIED COURT REPORTERS, INC.
115 PHENIX AVENUE
CRANSTON, RI 02920
(401) 946-5500

February 11th of 2004?
A. Okay.
Q. And near the top of that document under the section labeled complaint, there are typed letters which say, patient states she is here for stress; do you see that?
A. Yes.
Q. Do you know who would fill out that part of the form?
A. That would be the medical secretary taking the complaints at the front desk.
Q. So that would be based on information that was supplied by Ms. Schumacher; correct?
A. By the patient, correct.
Q. And the next shaded section down is entitled nursing notes, and there is handwriting in there; would that be filled out by the nurse?
A. The nurse or nursing assistant.
Q. The statement there says, patient states she is having problems at work with employees being/making her feel uncomfortable that the stress is -- I believe that says -- overwhelming to her, and it states, "she is very shaky," do you see that?
A. Yes.
Q. That would be a nurse that would fill that out?
A. Yes.
Q. Now, the statement which says, she is very shaky, do

you know what that means, does that mean physically shaky, or it is more metaphorical?
A. No, it means physical shaky, tremors.
Q. And then lower down in the shaded section I have just pointed it out to you, I need to know what this (indicating) means, this section here (indicating), I can't read that.
A. It basically reads, the subject, it refers to the patient was with situational stress, S-I-T. Stress at work. Objective, that she was teary, a teary, white female basically is the designation slash that she was counseled for her treatment.
Q. So does the counseled means that she was counseled here at this office?
A. Yes.
Q. Who would have done the?
A. I would have been discussing the stress with her and how we were going to approach it.
Q. And below that there is a section that says, diagnosis, and it says, SIT stress, could you please explain that diagnosis?
A. Situational stress.
Q. Could you please explain that diagnosis?
A. The diagnosis of situational stress is any stressor that the individual feels, that's theoretically,

temporary, that is sudden in onset, fairly acute in onset and that relates to an environmental context, whether it is relationships, a job, money, whatever that individual perceives the situation to be. It may be real or perceived, and one of the most common things we treat.

Q. How does situational stress differ from what we would genetically think of as a stress that you deal with in everyday life?

A. Well, when we designate it as a situational stressor, it is an external stressor, as opposed to long-term stress, where some people suffer from anxiety, that is, a free-floating general anxiety disorder. This notes that the person is engaged in an environmental stressor.

Q. And you mentioned that situational stress could be real or perceived; what did you mean by that?

A. Well, there are two parts to the stress, one is the environment, and one is how the individual reacts to the environment. So real would be, obviously, something that we all would agree is a stressor, and paranoia would be a false fear that could not be substantiated by perception.

Q. Is it relevant to your diagnosis of the situational stress whether or not it is real or perceived?

A. One of the guidelines for pain and for stress is that we, aside from the person in pure paranoia where their realty testing is not sound, we trust the individual's judgment that the pain is real, that the stressor is real.

Q. So when you made the diagnosis of situational stress, you were relying on statements made by Ms. Schumacher?

A. Yes.

Q. Do you recall what those statements were, generally?

A. She implicated that the working environment had gotten hostile, that there may be a skewing of age-related prejudice, in other words, the elder workers did not garner the same benefits as younger workers, that there was something of a party atmosphere at the work site, and that if you did not participate, you may be excluded, a somewhat prejudicial situation.

Q. Prejudicial in what sense?

A. In the sense that as she aged, as she fell out of this realm of the young worker going out and partying at night that she did not fit in.

Q. Did she mention any other stresses?

A. I think she implied that there was the issue of sexual harassment, but I did not note that.

Q. So that's based on your memory at this point?

A. Yes.

Q. Do you know if those statements by Ms. Schumacher were accurate or not?

A. I do not, I have to take the patient's story at face value.

Q. Did she have any -- I guess we talked about this -- physical manifestations of the stress -- you mentioned --

A. She had a deer-in-the-headlights look to her. You can often tell an individual who is under extreme stress by just their demeanor, and her demeanor was deer in the headlights, wide-eyed, tremors, voice shaky physically, tremors, teary, and I noted teary as one of my objective findings, and having had the nurse already note tremors, it was agreed that that was part of the physical finding.

Q. Continuing on to this medical record of February 11th of '04, there is a section on the bottom that says, light duty and total disability, do you see that?

A. Yes.

Q. And there is a notation next to it or above total disability that says, I believe that says, TDI; do you see that?

A. Yes, at the time, I recommended that she go on TDI, it being difficult to often establish a Workers' Compensation cause for stressors.

A. Yes.
Q. And is that your signature?
A. No, it is Angel Stedman's.
Q. I thought you said Angel Stedman --
A. My medical assistant.
Q. And the next page, it says, the patient is unable to work from 7/3/04 for a period of eight weeks?
A. Yes.
Q. And she could not return to her prior employment during that time?
A. Yes, right.
Q. And the final record states that the patient is unable to work from 8/28/04 for a period of two weeks?
A. Yes.
Q. And that coincides with the record we reviewed, saying that she may return to work on September 13, 2004?
A. Yes.
Q. So at least, according to these forms, Ms. Schumacher was unable to work from February 8, 2004 until September 13, 2004?
A. Yes, that would be the time line.
Q. Now, I will show you another document.
(DEFENDANT'S EXHIBIT D MARKED FOR I.D.)
Q. I am showing you a document that has been marked as Exhibit D, it's entitled medical certification form;

have you ever seen this document before?
A. No, I have not.
Q. And on the second page of that document, near the bottom, there is a section which says, I, and then there is a line; is that your signature there?
A. Yes, that's my signature.
Q. Would you have filled this out or a member of your staff?
A. No, this is filled out by my wife who does a lot of the forms and places the form in front of me and just has me sign it.
Q. And you know it is your wife's from the handwriting?
A. Yes.
Q. And do you know what happened to this form after you signed it?
A. I do not.
Q. Was this form, do you know if this was returned to Ms. Schumacher?
A. Usually, these get sent out, but I am not sure.
Q. Do you know how this form came into your office?
A. No, I do not.
Q. I will show you another document.
(DEFENDANT'S EXHIBIT E MARKED FOR I.D.)
Q. I am showing you what has been marked as Defendant's Exhibit E, this is a letter to you, or to your office,

minute. Actually, it is included and noted, mailed on 4/16/04, I believe so this L-H, Lisa Howe, H-O-W-E.

Q. So that initial LH and the fact that it was mailed and dated 4/16/04 is an indication that this Physician Statement of Fitness For Duty was mailed on that date; correct?

A. The Physician Statement of Fitness for Duty Release was mailed on 4/16/04 and a notation was that she was not fit for duty under Question Number 2.

Q. I want to redirect your attention to Exhibit D, entitled medical certification form, would you know, Doctor, if the Physician Statement of Fitness and the medical certification form would be documents that would be inclusive of each other?

MR. DORAN: Objection.

THE WITNESS: Can you rephrase?

Q. When submitting a fitness for duty release, would the medical certification form accompany that document?

A. I honestly cannot tell you under any or all circumstances whether that would be the case. Each case seems to generate its own forms, it is that different employers seem to generate different forms.

MR. SOLITRO: No further questions, doctor.

(BRIEF OFF-THE-RECORD DISCUSSION)