# EXHIBIT A

Q. She goes by Ti?
A. Yes.
Q. Do you know how old she is?
A. I would say about 78, somewhere in there.
Q. She's still employed by Fairfield Resorts, to your knowledge?
A. Yes, last I knew.
Q. Since the time of your termination by Fairfield, can you tell us whether or not you've sought alternate employment of any kind?
A. No, I have not.
Q. What are you doing; are you retired?
A. Well, I was forced to retire. I'm home.
Q. I guess my question is what are you doing -- what are you doing with yourself now?
A. Take care of my 88-year old mother.
Q. What is her name?
A. Frances.
Q. She lives with you?
A. Yes.
Q. Is that what you've been doing pretty much full time since your termination?
A. Not all of the time. Now since she's had a stroke, yes.
Q. When did she have her stroke?

apply for a job and you put down you were fired and you ask for a recommendation, normally it will not be a good one, through Fairfield.
Q. So, it was based on your assumption because you were terminated you couldn't then obtain other employment by revealing the termination?
A. Correct.
Q. Did you make any attempt to reapply with Fairfield Resorts?
A. No.
Q. Other than the preparation of your resume, did you do anything to seek employment?
A. I wasn't going to be able to get a position at my age and with what I had with Fairfield, the conditions.
Q. At the time --
A. The answer is no.
Q. So at the time how old were you?
A. 63.
Q. You were 63 years old?
A. I'll be 66 this year.
Q. And again, because of your age and your assumption about being blackballed you --
A. It's not an assumption, it happens in the industry.

left when Fairfield was there, I was at 24,000 a year.

Q. Was it your understanding that the $24,000 that you were paid was a draw against commissions?

A. No.

Q. It was your understanding that it was guaranteed to you regardless of whether you made a single sale?

A. It wasn't my understanding, that was the contract, yes.

Q. I'm asking what your understanding is.

A. I received $24,000 a year plus commissions.

Q. So, again, it was not a draw against commissions, your understanding is that that was salary, independent of commissions, correct?

A. Yes.

MR. ARON: Exhibit 4.

(DEFENDANT'S EXHIBIT 4 MARKED FOR IDENTIFICATION)

Q. Showing you what we've marked for identification as Exhibit 4, Schumacher Exhibit 4, for the record, a salesperson agreement which is Fairfield Resorts production numbers 57 through 63 and it appears to be dated as of February 13, 2003. Ms. Schumacher, is that a copy of the salesperson

had -- whatever I received, they received.
Q. At any time during the course of your employment by Equivest, Fairfield, Eastern Resorts, any of the prior owners, did you receive any kind of training?
A. Yes.
Q. Can you describe the training that you received?
A. Fairfield sent a manager down here to do a training program, it included management, it included salespeople. There was no form of training, per se, for a manager.
Q. So, it was collective training of all?
A. Yes.
Q. So you were not segregated from the salespeople but it was group training?
A. Correct.
Q. What did that group training consist of?
A. To prepare you to sell, to better your figures, to make more money, that's what it was all geared on, how they wanted you to present the point system, which was new to a lot of people. It was mostly geared upon training us how to sell points versus whole ownership.
Q. Do you recall when that group training took place?
A. It was some time in '03 when Fairfield came

in to take over. It was done within a few weeks.
Q. And when they took over --
A. It was done by a man by the name of Mr. Gotti.
Q. G-o-t-t-i?
A. I believe so.
Q. Do you know what his title was?
A. He was a training manager, manager.
Q. Did he review any of the company personnel policies and procedures, to your knowledge?
A. No.
Q. Was there any other training that you attended besides the group training with Mr. Gotti?
A. No.
Q. That was the only time you were ever trained on anything?
A. Yes, when they came -- because we're not familiar with the point system. We knew how to sell the weeks, but when it was bought by Fairfield, they had a point system and everyone had to be trained on the point system.
Q. Can you describe the point system, as you understood it?
A. You buy points instead of a week.
Q. Was this documented in any company manual or

would then say thank you for coming, have a nice day and your gifts are waiting. Then the Discovery department would go to the table and repitch them on what was called an Exit or Discovery program, they just changed the names. It would mean that they would get a trial program. They would get so many points to be used within a year, and it would be like $99 a month for a year, that way the company didn't lose -- if they didn't make the sale, they would have had a chance of getting it through the Discovery or the Exit program, and then when they came back to take their vacation, they would be pitched by a salesperson again, so they would have multiple chances of making a sale.

Q. What you just described, was that a system that existed for both Discovery and Exit?

A. Yes.

Q. Maybe I'm not clear, so forgive me if I'm asking a question that's silly, but what's the difference then between the Discovery and Exit program?

A. Just the name. Changed the name.

Q. So Discovery or Exit was basically the same program, but it was just being offered at a particular period of time in the sales process?

A. I don't think there were others.
Q. Is it fair to state that if you had a concern about either the integrity or lawfulness of the company's conduct, you could anonymously call the hotline; is that correct?
A. You could.
Q. You didn't, right?
A. Doesn't work.
Q. I didn't ask you whether it worked or didn't work, I asked you whether you did and you testified that you did not, correct?
A. I had called the hotline at one time, no one called me back.
Q. When was that?
A. It was not for me, it was for someone else that I was calling. I had people working for me that I told them to call the hotline. They came back and told me it didn't work.
MR. ARON: Could you read back the response?
(ANSWER READ)
Q. Who did you tell to call the hotline?
A. I'm not sure who it was at this point, but through the course of my employment people that worked for me had some grievances and I would tell

A. In the office.
Q. Where in the office was that?
A. It would have been where the office girls worked, not where the salespeople work.
Q. Was it up on a bulletin board.
A. I never saw it.
Q. You didn't see it?
A. No.
Q. But you're aware that they were posted?
A. I'm sure that they were posted somewhere. I never saw them.
Q. Was there a human resources liaison for Fairfield Resorts at the Newport facility?
A. No.
Q. Was there someone that you would consult at another location if you had a question concerning human resource issues?
A. Bill Subracco (phonetic).
Q. Who is Bill Subracco?
A. Human resource.
Q. Do you know what his title was?
A. No, I don't know. I know he was the one that would come to Newport and do a meeting or whatever he -- when we had difficulty, he would come.
Q. Mr. Subracco would come to the Newport facility

A. Yes.
Q. Can you describe that for me, when that occurred and what occurred?
A. It was with John Thomas.
Q. At what point in time?
A. I don't remember the dates. It was when Fairfield first took over.
Q. What did Mr. Thomas say to you?
A. He said that I was not hiring any people and my job was to hire people.
Q. Anything else?
A. No.
Q. Where did this meeting take place?
A. At the Inn On The Harbor.
Q. I'm sorry?
A. At the In On The Harbor.
Q. What was the circumstance, did he ask to meet with you at this location?
A. Yes.
Q. How long was the meeting?
A. Ten minutes.
Q. Did you say anything to him?
A. I explained to him that I did.
Q. You did what?
A. I did hire.

Q. What did he say to you?
A. He wasn't aware of it at the time. I showed him my figures, he asked me where I got them from, I told them from the accounting girl. He said it was the first he had seen those figures.
Q. What, if anything, happened after that?
A. He said he wanted me to run the Discovery program.
Q. When was that? Is this in the same meeting that you're describing where you were told that --
A. Yes.
Q. That you had not done a sufficient amount of recruiting?
A. Yes.
Q. Were you given a corrective action?
A. My corrective action was that I had to have my team in three nights a week to call people on the phone.
Q. So the answer is yes?
A. Yes.
Q. Were you in receipt of more than one corrective action in your employment by Fairfield Resorts?
A. He told me that he was going to discard that one that he wrote if I did a good job.
Q. Were you also criticized for a higher than

Q. Is that also true of Exhibit 8?
A. Yes.
Q. Exhibit 8, which is dated August 15, 2002, did you have another meeting with Mr. Thomas concerning the subject matter of that corrective action?
A. I spoke with him on this one, yes.
Q. So did you have a meeting in August of 2002 at the time that --
A. Yes.
Q. At the time this corrective action was given to you?
A. I showed him figures that contradicted what he had said.
Q. Ms. Schumacher, I understand that you have a perspective on this. I'm asking you whether Mr. Thomas met with you concerning the subject matter of this corrective action?
A. He had to. Yes.
Q. And when you received this, did you understand that this was as it's described, the most serious corrective action taken just short of dismissal?
A. You have to get three of these and then you're dismissed.
Q. Is that what you understood?
A. Yes.

A. Yes.
Q. Who did you speak to?
A. I don't remember the name.
Q. Did you tell Mr. Hutnick that you spoke to the vice president of sales in Wisconsin?
A. It was a manager or vice president of sales. I don't remember which one.
Q. Eric Sellers?
A. I don't know. I don't remember the name.
Q. Did you tell Mr. Hutnick that after calling to Wisconsin Dells that they claimed that they did not even have an Exit program?
A. That's right.
Q. Did you tell Mr. Hutnick that he lied to you?
A. No, I didn't say that.
Q. Did Mr. Hutnick tell you that in fact there was an Exit program in Wisconsin?
A. He said that there was a program in Wisconsin, but it wasn't apples to apples, it was oranges to apples was the expression.
Q. Did he tell you that the Exit program was run through the front line managers in Wisconsin?
A. No, Wisconsin told me that their reps were selling the Exit program, and they were very slow and that was the reason for it. They told me they

A. I just didn't.
Q. Did you have discussions with any of your co-workers about Mr. Hutnick?
A. I had mentioned what he did to me to a couple of workers.
Q. Was that Dave Lemlar, L-e-m-l-a-r?
A. Yes.
Q. Anyone else?
A. I believe Coppa heard, I believe he heard some of what went on because his table was there.
Q. Where did this discussion take place when you say --
A. In the sales office.
Q. It was in the sales office?
A. In the sales lounge.
Q. That was the discussion you were talking about earlier where you believe Mr. -- from your observations that Mr. Hutnick was angry and called you an offensive name?
A. Correct.
Q. Now you had a scheduled vacation at the end of January of 2004; is that correct?
A. Yes.
Q. You were going to Florida?
A. Yes.

Q. Did you talk to Mr. Hutnick at all?
A. No.
Q. Did you call anyone at Fairfield Resorts to let them know that you were going to need to be out for a leave of absence?
A. I had talked with Linda Weber (sic).
Q. When did you speak to Ms. Weber?
A. I don't specifically recall.
Q. What is Ms. Weber's title?
A. I believe she was the administration -- manager of admin.
Q. Was she somebody that you knew at the Newport facility?
A. No.
Q. Was she located at another facility?
A. No.
Q. She was at Newport?
A. Yes.
Q. But you didn't know her?
A. No.
Q. To your knowledge, was she someone that was responsible for administering leaves of absence?
A. I don't know.
Q. You didn't know. Did you submit any other forms in connection with taking a leave of absence?

A. Yes, I did.
Q. Do you recall what it was that you submitted?
A. It was certification.
MR. ARON: Exhibit 12 for identification.
(DEFENDANT'S EXHIBIT 12 MARKED FOR IDENTIFICATION)
Q. Showing you what we've marked for identification as Exhibit 12, for the record, a document entitled Medical Certification Form, dated on the second page?
A. 4-10.
Q. Well, actually at the bottom of the first page, it says 4-10-04 next to, "Patient was last seen on," but at the top of the page or at least in the box at the top it has a date of March 30, '04 and the signature of Shirley Schumacher. Is that your signature, Ms. Schumacher?
A. Yes.
Q. Is this a medical certification form that you filled out and then submitted to your doctor?
A. No. The doctor filled it out.
Q. But you filled out the section in the box on the first page at the top, correct?
A. I filled my name on it, yes, my Social

Security and my signature.

Q. So you put in on the first page under Section A, you filled in employee's name, your Social Security number, and date of birth?

A. Yes.

Q. And did you check off the reason for leave a serious health condition?

A. No.

Q. That was your doctor that filled that out?

A. Yes.

Q. Did you sign this form before you gave it to your doctor, or was it after your doctor gave it back?

A. I didn't receive it back. He sent it.

Q. Okay. So you signed the place for the signature, you dated it March 30, '04, correct?

A. Yes.

Q. Is there any other writing on this form, first or second page that you filled out other than what you've testified to?

A. No.

Q. The rest was filled out by your doctor?

A. Correct.

Q. This form was filled out at the request of Fairfield Resorts; is that correct?

A. I think so.

Q. One of the options that he talked to you about was that you would --
A. He didn't talk to me about that then.
Q. I'm confused. Who talked to you before you went out on your leave of absence, Mr. Hutnick?
A. Joe Hutnick, yes.
Q. And you just said a few moments ago that Mr. Hutnick discussed with you the fact that he would be making some changes?
A. And he would discuss it with me when I come back.
Q. Did he discuss with you what the potential changes would be?
A. Not really, no.
Q. Did he tell you that you would no longer be a manager?
A. Yes.
Q. Did he tell you that he was considering having you work with Dick McKenna as a front line rep.?
A. No.
Q. Are you still in touch with Tea?
A. I think I heard from her about four months ago.
Q. Is she a friend of yours?
A. Somebody I've worked with for years, but

or after?
A. I don't recall.
Q. Why did you contact CORE?
A. I don't know.
Q. Do you know if you ever did contact CORE?
A. I spoke with someone at CORE at one time.
Q. How was that?
A. I don't remember all of the details.
Q. How did that contact come about? Did you contact them or did they contact you?
A. I don't remember.
Q. Did you apply for short-term disability benefits from CORE?
A. Short-term disability? No, I went with TDI.
Q. Did you ever discuss short-term disability benefits with CORE?
A. I found out how much I was going to get through short-term disability through Fairfield, and it was less money than I would get with TDI from the State, so I chose the TDI.
Q. How did you find out how much you would get from short-term disability benefits?
A. You know, I really can't be sure, but it could be that I may have found that out from Fairfield. I'm not sure.

Q. Could it have been CORE that you found that out from?
A. I don't know. It could be.
Q. After you found out -- after you decided not to apply for short-term disability benefits, did you ever speak with anyone at CORE regarding family medical leave?
A. I must have spoken to someone because they sent me applications, and I followed through on what I was supposed to on that.
Q. Who sent you applications?
A. I don't know. Whatever I received, I filled out and sent to the proper place.
Q. Did you receive applications from CORE or from Fairfield?
A. I can't tell you. I don't know.
Q. I'm going to show you the document that was marked as Exhibit 12, Defendant's Exhibit 12, that's the medical certification form completed in part by you and in part by Dr. Gloor?
A. Yes.
Q. Did you ever submit that document to CORE?
A. My physician submitted it. I did not. I don't know where he submitted it to.
Q. You don't know if he submitted it to CORE?